UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MASERAH FOR EDUCATIONAL SERVICES, LLC,<br><br>PLAINTIFF<br><br>v.<br><br>ALFRED UNIVERSITY,<br><br>DEFENDANT | CASE NO. 20-cv-<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Maserah for Educational Services, LLC ("Maserah"), by its attorneys Gallet Dreyer & Berkey, LLP, as and for its Complaint, alleges with personal knowledge as to its own actions, and upon information and belief as to those of others, as follows:

**Preliminary Statement**

1. This action arises from defendant Alfred University's ("AU") multiple breaches of its exclusive "Recruitment Agreement" with Maserah for the recruitment of international students from Saudi Arabia, the circumstances created by AU after that breach, and Maserah's attempts to distance itself from AU's questionable practices toward those international students.

2. Despite the undisputed fact that AU owes Maserah at least $466,184.70, AU has withheld that amount in violation of the covenant of good faith and fair dealing implicit in the Recruitment Agreement. Rather, AU has held that undisputed amount hostage, demanding concessions that AU is not entitled to in an attempt to increase its bargaining power and persuade plaintiff to waive its right to other commission payments.

3. AU has further breached the Recruitment Agreement by withholding commissions Maserah earned for recruiting those students, by failing and refusing to pay Maserah for

1

commissions Maserah earned under that agreement, and by going around Maserah to recruit students from Saudi Arabia despite Maserah's exclusive right to recruit those students.

4. AU is refusing to take the necessary steps to collect tuition from students that Maserah recruited – students who are currently taking classes at AU – in a blatant disregard of AU's own express policy to do so.

5. While communicating with the international students, Maserah learned that AU had employed international students that are precluded by their immigration status from employment. Maserah informed AU that Maserah would not be affiliated with AU's practices that potentially violated immigration law since they seriously jeopardized Maserah's reputation and standing with immigration officials. AU responded in a manner to deflect the blame for these unlawful practices and claimed that Maserah was "harassing" the students. AU has also charged Maserah-recruited Saudi students, who are sponsored by the Saudi government, higher tuition than the publicly released tuition rates.

6. AU communicated directly with the Maserah-recruited students in a letter which incorrectly suggested that Maserah had threatened, or would threaten, those students and potentially jeopardizing the students' finances, housing, education and immigration status.

7. Maserah recently learned that AU has refused to re-enroll Saudi students whom Maserah had recruited. AU informed those students they must re-enroll separately, in a bald attempt to have those students enroll at the behest of AU and not through Maserah's recruitment efforts. Maserah sought reassurance that AU will not take this position to deprive Maserah of the commissions for each of those students. Despite Maserah's multiple attempts to seek reassurance that AU will not advance this untenable interpretation of the Recruitment Agreement, AU has simply refused to respond, leading to an anticipatory breach of the Recruitment Agreement.

8. Maserah's informal attempts to resolve these issues fell on deaf ears, requiring Maserah to file this action to vindicate its rights under the Recruitment Agreement, to prevent AU from affiliating Maserah with AU's questionable commercial practices and to protect Maserah's reputation from AU's false, defamatory statements.

### Jurisdiction and Venue

9. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 because Maserah brings claims under the laws of the United States.

10. The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and damages sought in this action exceed $75,000.

11. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and (b)(2). Defendant AU resides in this district and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within this district.

### Parties

12. Plaintiff Maserah is a limited liability company that is established under the laws of the state of Florida, with its principal place of business in Wisconsin. Maserah is in the business of recruiting international students for American universities, and has maintained an excellent reputation with American universities and immigration officials.

13. Defendant AU is a private university located in Alfred, New York, established as a non-profit corporation under the laws of the state of New York.

### Allegations

#### AU Refuses to Pay Commissions for Allen Terms and Summer Semesters

14. An AU student may take classes during four terms at AU, which are:

      a. the Summer Semester;

      b. the Fall Semester;

      c. the Allen Term; and

      d. the Spring Semester.

15.    The "Allen Term" consists of "On-line and hybrid (online and on-site) courses available for students to enroll in between the fall and spring semesters (mid-December through mid-January)."

16.    The Summer Semester consists of "Courses available for students to enroll in between the spring and fall semesters (mid-May through mid-August)."

17.    On June 6, 2018, Maserah and AU entered into the Recruitment Agreement. A true and correct copy of the Recruitment Agreement is annexed hereto as <u>Exhibit A</u>.

18.    Under the Recruitment Agreement, Maserah was to be AU's exclusive recruiter of international students from Saudi Arabia for AU.

19.    In return for Maserah's services, Maserah would be paid a twenty-seven percent (27%) commission on "tuition … paid by the student for the first three consecutive academic years the student attends AU…" "Tuition" is defined in the initial Recruitment Agreement, <u>Exhibit A</u>, in a provision entitled "Payment," as excluding room and board and any other non-tuition related charges paid by the student for the first three consecutive academic years the student attends AU. The Recruitment Agreement does not exclude commissions earned for tuition paid by students to attend either the Allen Term or the Summer Semester.

20.    Maserah and AU amended the Payment provision on August 7, 2019, the "First Amendment." A true and correct copy of the First Amendment is attached hereto as <u>Exhibit B</u>.

The First Amendment clarified the time in which Maserah would provide invoices for AU for new and matriculating students, depending on which Semester the student began attending AU.

21. During the month of October 2019, and prior to the parties signing another amendment to the Recruitment Agreement, Maserah repeatedly asked AU for confirmation of the students who had attended the 2019 Summer Semester, so that Maserah could properly invoice AU for its commission for that term. At that time, AU provided Maserah with a commission statement which included the names of 39 students with the corresponding tuition amounts for the 2019 Summer Semester. This commission statement is clear evidence that AU knew that Maserah was entitled to those commissions pursuant to the Recruitment Agreement. A true and correct copy of that email is attached hereto as <u>Exhibit C</u>.

22. Maserah also requested AU to confirm the students who had attended the 2018 Allen Term, so that Maserah could properly invoice AU for its commission for that term. AU failed to provide Maserah with the list of students who attended the 2018 Allen Term and refused to pay Maserah commissions for the 2018 Allen Term and the 2019 Summer Semesters..

23. Days after AU provided Maserah with the information to invoice AU for the 2019 Summer Semester, on October 26, 2019, Maserah and AU entered into another amendment, the "Second Amendment." A true and correct copy of the Second Amendment is annexed hereto as <u>Exhibit D</u>.

24. The Second Amendment clarified the parties' long-held understanding that Maserah was entitled to commissions for students that enrolled in the Allen Term and Summer Semester. The Second Amendment states

> Summer Term and Allen Term are opportunities outside of the traditional academic year's two semesters when students may choose to enroll for college credit at AU. A payment of 27 percent of net tuition for Summer and Allen Terms will be made by AU to

> Recruiter for students who enroll at AU through the Recruiter being the procuring cause for the enrollment and provided that the student has paid their bill.

25. Despite the fact that the parties entered into the Second Amendment to clarify Maserah's entitlement to commissions for all tuition payments from students, including the Allen Term and Summer Semester at AU, and despite the fact that AU had provided Maserah with the information that Maserah needed to invoice AU for the 2019 Summer Semester, AU refused to pay Maserah commissions for students who enrolled in prior Allen Terms and Summer Semesters.

26. To date, AU owes Maserah $48,872.70 for Maserah-recruited students who enrolled in the Allen Terms and Summer Semesters from 2018 to 2019. Maserah has demanded that amount, but AU has refused and continues to refuse to pay Maserah.

<u>AU Refused to Pay Undisputed Amounts,</u>
<u>Refused to Collect Tuition to Pay Maserah's Commissions,</u>
<u>Attempted to Re-enroll Saudi Students without Maserah,</u>
<u>and Recruited Saudi Students</u>

27. During early 2020, AU and Maserah began to discuss the amount AU owed to Maserah.

28. The parties agreed that AU owes Maserah at least $466,184.70.

29. In addition, Maserah identified twelve students whom it had recruited but for whom AU did not pay commissions.. Maserah informed AU that, with the inclusion of those twelve students, AU owed $529,991.10 in overdue commissions.

30. AU claimed that, of those twelve, ten had not paid tuition and therefore AU did not have an obligation to pay Maserah's commissions for recruiting those ten students.

31. AU has refused to pay the concededly owed $466,184.70 to Maserah unless and until Maserah agreed to waive its commissions related to the students who enrolled in the Allen

Term and Summer Semesters from 2018 to 2019 as well as the commissions related to students who are delinquent in their tuition payments.

32. AU's Assistant Director of International Student Services Allison Church, on behalf of AU, informed Maserah-recruited students that AU would not permit students who did not pay tuition to remain on campus.

33. Before the beginning of the 2020 Allen Term, Church emailed international students and informed those students that they must pay 100% of their tuition prior to the beginning of that term. A true and correct copy of that email is annexed hereto as Exhibit E.

34. Despite the fact that the ten students have not paid tuition, AU has permitted those students to remain on campus and enrolled in classes in complete contravention to AU's policy regarding tuition payments.

35. AU informed Maserah that Maserah will only be paid for students it recruits in the future once those students decide to pay their tuition – a position which Maserah has rejected because AU is contributing to the delay by relaxing its own rules and allowing students that are not making their tuition payments to remain on campus.

36. AU has ignored Maserah-recruited students who wish to defer their enrollment to the 2020 Fall Semester. Rather, Church, on behalf of AU, has informed Maserah-recruited students who wish to defer that AU has no record of their enrollment, and that the students must submit a new application directly to AU. The submission of a brand new application from each student directly to AU will exclude Maserah as the source of the referral, jeopardizing the commissions arising from those students who would have been officially accounted as Maserah's referred-students but AU's suspicious requests for re-application. A true and correct copy of an email from Church, which is an example of this practice, is annexed hereto as Exhibit F.

37. Maserah has informed AU that its demand to Maserah-recruited students to re-enroll is an attempt to claim that AU, not Maserah, is responsible for those students' attendance at AU. AU's demand that students re-enroll effects one-hundred thirteen Maserah-recruited students, the commissions for which is more than $3 million.

38. Maserah sought assurance from AU on January 30, 2020 that AU will not take the untenable position under the Recruitment Agreement that re-enrolled students whom Maserah had recruited had not enrolled due to Maserah's efforts, and that Maserah is still entitled to commissions for those students. AU refused to respond.

39. AU's position is untenable because the agreement states that Maserah receives a commission for every student it refers to AU – if AU is asking the students to re-apply without Maserah's involvement, then AU has an obligation to acknowledge Maserah's rights under the Agreement.

40. Maserah again sought assurance from AU on February 21, 2020 that AU will not take the untenable position under the Recruitment Agreement that re-enrolled students whom Maserah had recruited had not enrolled due to Maserah's efforts, and that Maserah is still entitled to commissions for those students. AU again refused to respond.

41. Maserah again sought assurance from AU on April 7, 2020 that AU will not take the untenable position under the Recruitment Agreement that re-enrolled students whom Maserah had recruited had not enrolled due to Maserah's efforts, but that Maserah is still entitled to commissions for those students. AU once again refused to respond.

42. Since AU will interpret the Recruitment Agreement in an untenable fashion, and has refused to respond to Maserah's numerous attempts to reassure Maserah of AU's interpretation, AU has caused an anticipatory breach of the Recruitment Agreement with respect

to the students recruited by Maserah whom AU is requiring to re-enroll. Maserah is entitled to approximately $3,210,506.28[1] in commissions for the 113 Maserah-recruited students whose enrollment will be affected by AU's untenable interpretation of the Recruitment Agreement.

43. On information and belief, AU has retained a third party to recruit, and through that third party, has recruited students from Saudi Arabia in violation of Maserah's right to be AU's exclusive recruiter under the Recruitment Agreement.

Maserah Seeks to Distance Itself from AU's Unlawful Practices

44. In early 2020, Maserah learned of several potentially questionable practices in which AU had engaged.

45. First, Maserah learned that AU has hired an A1/A2 Visa holder as a "liaison recruiter" of new Saudi students, which Maserah believes violates United States immigration law, including but not limited to 8 C.F.R. § 214.2.

46. Second, Maserah learned that AU has charged Saudi students a higher tuition than other international students.

47. Maserah sought AU's confirmation of the tuition due for the 2018 Fall Semester. AU's published tuition for engineering students was $26,308 for each term, although Maserah-recruited engineering students who were sponsored by the government of Saudi Arabia were being invoiced $32,364 for the same exact term and curriculum. The majority of students whom Maserah has recruited for AU are engineering majors. A true and correct copy of an invoice reflecting the higher tuition amount charged to a Maserah-recruited engineering student is annexed hereto as Exhibit G.

---

[1] Based on information that Maserah has obtained from AU, the tuition for Fall 2020 and Spring 2021 is $35,076 without including the Summer Semester and the Allen Term.

48. However, AU informed Maserah in an email that tuition for the Saudi business and engineering students would be $32,346.00 for the 2018 Fall Semester, a substantial and baseless increase of roughly $6,000 per year. A true and correct copy of that email is annexed hereto as Exhibit H.

49. Maserah once more sought clarification of AU's tuition costs during April 2019. Still, AU's posted tuition costs for engineering students was only $26,308, although AU continued to invoice Maserah-recruited engineering students for higher amounts. A true and correct copy of an invoice reflecting annual tuition of $26,308 is annexed as Exhibit I.

50. AU responded to Maserah's April 2019 request for clarification by informing Maserah in an email that engineering students would be charged $34,770 for tuition and fees, despite the published price remaining $26,308. A true and correct copy of that email is annexed hereto as Exhibit J.

51. Maserah warned AU that AU's questionable practices would injure Maserah's reputation both with students and with immigration officials. AU responded that Maserah was "harassing" AU.

52. Maserah seeks to enjoin AU's false affiliation of Maserah with AU's questionable practices, along with all damages caused by that false affiliation and disgorgement of any profits AU made on that false affiliation.

AU Defames Maserah, Causing Several Students to Sever their Relationship with Maserah

53. After Maserah and AU began their dispute regarding the commissions owed to Maserah, Church sent a letter (the "Church Letter") directly to all students whom Maserah had recruited. A true and correct copy of that letter is annexed hereto as Exhibit K.

54. The Church Letter falsely implied that Maserah had "threatened or bullied" or that Maserah encouraged students to leave AU, and that Maserah was threatening the students' ability to obtain financial aid, housing, education and immigration status.

55. Due to the Church Letter, several international students that Maserah had recruited severed their existing relationship with Maserah, and the number of referrals that Maserah received from students it had recruited dropped steeply.

## FIRST CLAIM
(*Breach of Contract*)

56. Maserah repeats and re-alleges the allegations set forth in each of the preceding paragraphs of this Complaint.

57. Maserah and AU entered into the Recruitment Agreement.

58. Maserah has performed all of its obligations under the Recruitment Agreement, but AU has breached the Recruitment Agreement in several ways.

59. AU has breached the Recruitment Agreement by refusing to pay Maserah the commissions for students who have attended AU's Allen Term and Summer Semester, despite the fact that the parties always intended Maserah to be entitled to commissions for students attending the Allen Term and Summer Semester.

60. AU has breached the Recruitment Agreement by refusing to pay Maserah the undisputed amount of $466,184.70, without any justification for withholding that amount. AU has withheld that amount to deprive Maserah of Maserah's benefits under the Recruitment Agreement, to strengthen AU's bargaining position with respect to the parties' other disputes.

61. AU has breached the Recruitment Agreement by refusing to pay Maserah commissions for students whom Maserah recruited to attend AU, although AU has continued to

allow those students to attend AU, and has refused to collect the tuition from those students in an attempt to deprive Maserah of Maserah's benefits under the Recruitment Agreement.

62. AU has breached the Recruitment Agreement by recruiting Saudi students, through a third party, to attend AU in violation of the Maserah's right to be AU's exclusive recruiter of Saudi students. Specifically, AU identified Maserah as its exclusive recruiter of Saudi students in the Recruitement Agreement, as follows:

> "AU desires to engage the Recruiter to provide AU with the Services identified below, and to permit the Recruiter to act as the exclusive recruiter for AU for such Services in Saudi Arabia, subject to and in accordance with the terms and conditions hereof"

63. AU's breaches have damaged Maserah by an amount to be determined at trial, but in an amount no less than $529,991.10, which will continue to increase until trial.

## SECOND CLAIM
*(Anticipatory Breach of Contract)*

64. Maserah repeats and re-alleges the allegations set forth in each of the preceding paragraphs of this Complaint.

65. AU is obligated to collect tuition from students that Maserah has recruited to provide Maserah with the benefit of its bargain under the Recruitment Agreement.

66. AU has informed Maserah that it will only pay commissions once students have voluntarily paid tuitions, and AU refuses to collect tuitions from those students that have not paid, and in that fashion has repudiated its obligation to pay Maserah the commissions it has earned.

67. AU's obligation to pay Maserah commissions that Maserah has earned is a material provision of the Recruitment Agreement that goes to the essence of that agreement.

68. Despite AU's repudiation of its obligation to provide commissions to Maserah, Maserah is ready, willing and able to recruit students for AU under the Recruitment Agreement.

69. AU has required Maserah-recruited students to re-enroll without basis. AU's demand to those students to re-enroll has been made for the apparent purpose of cutting Maserah out of its commissions, due to the untenable position that Maserah's recruitment efforts were not the cause of those students' enrollment.

70. Maserah has sought assurance on three separate occasions that AU will not advance this untenable position, but AU has refused even to respond to Maserah's requests. AU has anticipatorily breached the Recruitment Agreement by adopting this untenable interpretation of the Recruitment Agreement.

71. Maserah is entitled to the damages for AU's multiple anticipatory breaches of the Recruitment Agreement, in an amount of approximately $3,210,506.28 with the exact amount to be determined at trial.

## THIRD CLAIM
(*Declaratory Relief - 28 U.S.C. § 2201*)

72. Maserah repeats and re-alleges the allegations set forth in each of the preceding paragraphs of this Complaint.

73. AU is obligated to collect tuition from students whom Maserah has recruited to provide Maserah with the benefit of its bargain under the Recruitment Agreement.

74. AU has informed Maserah that it will only pay commissions once students have voluntarily paid tuitions, a position which Maserah rejects because it appears that AU is refusing to collection tuition payments from Maserah-recruited students by allowing these students to remain on campus in contravention to AU's express policy.

75. There is now a substantial dispute between the parties regarding AU's position that it will not collect tuition from students that Maserah has recruited.

76. This dispute has occurred and will continue to occur since AU has informed Maserah that this is the course of action that AU will take.

77. Maserah has sought assurance on multiple occasions that it is still entitled to commissions despite AU's demand that Maserah-recruited students must re-enroll for the 2020 Fall Semester.

78. AU has refused to respond to Maserah's multiple requests for assurance regarding AU's interpretation of the Recruitment Agreement with respect to AU's position regarding re-enrollment.

79. Further, AU's practice will continue to occur until the Court declares that AU's continue that practice.

80. Maserah seeks a declaration of the parties' rights and obligations under the Recruitment Agreement.

## FOURTH CLAIM
(*Breach of Covenant of Good Faith and Fair Dealing*)

81. Maserah repeats and re-alleges the allegations set forth in each of the preceding paragraphs of this Complaint.

82. Despite AU's admission that AU owes $466,184.70, AU has refused to pay that amount for the illegitimate purpose of increasing AU's bargaining strength in the parties' other disputes, and has refused to pay this undisputed amount in breach of the implied covenant of bad faith and fair dealing which is implicit in the Recruitment Agreement.

83. AU's bad faith and illegitimate refusal to pay the undisputed amount of $466,184.70 has caused Maserah to incur damages in an amount to be determined at trial.

84. AU's bad faith and illegitimate refusal to pay was undertaken with malice and with conscious disregard of Maserah's rights, entitling Maserah to punitive damages.

## FIFTH CLAIM
*(Violation of the Lanham Act – 15 U.S.C. §1125(a)(1)(A))*

85. Maserah repeats and re-alleges the allegations set forth in each of the preceding paragraphs of this Complaint.

86. Maserah does not sponsor or approve of AU's commercial activity of hiring visa holders who are not permitted to work.

87. AU has used a combination of words, terms, names, symbols or devises, or a combination thereof, in a manner which is likely to cause confusion, or has caused confusion, caused mistake or has deceived regarding Maserah's sponsorship or approval of AU's commercial activity of hiring visa holders that are not permitted to work.

88. Maserah does not sponsor or approve of AU's commercial activity of charging Saudi students higher tuition than any other international or domestic students.

89. AU has used a combination of words, terms, names, symbols or devises, or a combination thereof, in a manner which is likely to cause confusion, or has caused confusion, caused mistake or has deceived regarding Maserah's sponsorship or approval of AU's commercial activity of charging Saudi students higher tuition than other international students.

90. Pursuant to 15 U.S.C. §1117(a), Maserah seeks all damages caused by, disgorgement of profits obtained through, and injunctive relief to prevent AU's continued use of words, terms, names, symbols or devises, or any combination thereof, in a manner which is likely to cause confusion regarding Maserah's sponsorship or approval of AU's commercial activities as described above.

## SIXTH CLAIM
(*Defamation Per Se*)

91. Maserah repeats and re-alleges the allegations set forth in each of the preceding paragraphs of this Complaint.

92. Through the Church Letter, AU made false statements to Maserah's referred international students, without Maserah's authorization.

93. AU published the Church Letter with reckless falsity of the statements contained therein, or was, at a minimum, negligent in publishing the Church Letter.

94. The Church Letter is defamatory per se because it contains statements that impart to Maserah unfitness to conduct Maserah's business, and Maserah has suffered damage to its business reputation as a result.

95. AU made the statements in the Church Letter with malice and in reckless or conscious disregard of the truth of the matters stated therein, entitling Maserah to punitive damages.

## SEVENTH CLAIM
(*Tortious Interference with Prospective Business Relations*)

96. Maserah repeats and re-alleges the allegations set forth in each of the preceding paragraphs of this Complaint.

97. Maserah maintained a business relationship with international students who attended AU.

98. AU knew of Maserah's relationship with the international students who attended AU and interfered with those relationships in a tortious or otherwise wrongful manner.

99. AU interfered with Maserah's relationship through distribution of the Church Letter, which has caused Maserah to lose referrals from students who received the Church Letter.

100. AU further interfered with Maserah's relationship through its act of re-enrolling students who sought to defer their enrollment to the 2020 Fall Semester, at a cost of more than $3,000,000.

101. AU's interference with Maserah's business relationship with the international students who attended AU has caused Maserah damages in an amount to be determined at trial, but in any event, no less than $3,210,506.28.

102. AU interfered with Maserah's business relationships with malice and in conscious disregard of Maserah's rights, entitling Maserah to punitive damages.

## **Prayer for Relief**

WHEREFORE, Maserah respectfully requests this Court enter judgment in Maserah's favor for the following:

1. Compensatory damages, to be proven at trial;
2. Punitive damages, to be proven at trial;
3. Disgorgement of profits;
4. A declaration that AU's refusal to collect tuition from Maserah-recruited students who remain on AU's campus is not a basis to withhold commissions that Maserah is entitled to;
5. A declaration that AU's position of re-enrollment is not a basis to withhold commissions to which Maserah is entitled.;
6. Injunctive relief, precluding AU and its personnel from using any use of words, terms, names, symbols or devises, or any combination thereof, in a manner which is likely to cause confusion regarding Maserah's sponsorship or approval of AU's commercial activity of hiring visa holders who are not permitted to work.

7. Injunctive relief, precluding AU and its personnel from using any use of words, terms, names, symbols or devises, or any combination thereof, in a manner which is likely to cause confusion regarding Maserah's sponsorship or approval of AU's commercial activity of charging Saudi students higher tuition than other international students;

8. Prejudgment interest;

9. All reasonable costs and disbursements incurred in this action, including reasonable attorney's fees; and

10. Grant other such relief as this Court may deem proper.

Dated: New York, New York
       May 27, 2020

                                        GALLET DREYER & BERKEY, LLP

                                        By:    /s David S. Douglas,
                                                  David S. Douglas, Esq.
                                                  dsd@gdblaw.com
                                                  Francelina M. Perdomo, Esq.
                                                  fmp@gdblaw.com
                                                  Kyle G. Kunst, Esq.
                                                  kgk@gdblaw.com
                                                  845 Third Avenue, 5th Floor
                                                  New York, New York 10022
                                                  (212) 935-3131

                                                  Attorneys for Plaintiff
                                                  *Maserah for Educational Services*